UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


TALYA LANNAN,
Plaintiff,


v.                                                CIVIL ACTION NO. 23-10638-MPK[1]


MARTIN O'MALLEY,[2]
Commissioner, Social Security Administration,
Defendant.


MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE THE
DECISION OF THE COMMISSIONER (#11)
AND MOTION TO AFFIRM THE COMMISSIONER'S DECISION (#18).


KELLEY, U.S.M.J.

## I.    INTRODUCTION.

Plaintiff Talya Lannan seeks reversal of the decision of defendant Commissioner of the

Social Security Administration denying her a period of disability and disability insurance benefits.

(#11.)   Defendant Commissioner of the Social Security Administration moves to affirm the

Commissioner's decision. (#18.) The administrative record and supporting briefs have been filed.

(##12, 19, 20, 21.) For the reasons set out below, plaintiff's Motion to Reverse the Decision of the

---

[1] With the parties' consent, this case has been reassigned to the undersigned for all purposes, including the entry of judgment. (#8.)

[2] This case was originally filed against Kilolo Kijakazi, then the Acting Commissioner of the Social Security Administration. Martin O'Malley was sworn into office as Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley, in his official capacity, is being automatically substituted as the defendant.

Commissioner (#11) is ALLOWED in part and DENIED in part and the Motion to Affirm the Commissioner's Decision (#18) is ALLOWED in part and DENIED in part.

II.   <u>BACKGROUND.</u>

A. <u>Procedural History</u>.

Ms. Lannan filed an application for Title II disability insurance benefits on February 23, 2021, alleging a disability onset date of February 4, 2019. (AR[3] 9-3 at 11; 9-4 at 2-3; 9-8 at 2-4.) The claim was denied on August 3, 2021, and again on reconsideration in September 2021. (AR 9-4 at 2-13; 9-5 at 3-6, 12, 14-17.) On November 9, 2021, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held by telephone[4] on June 2, 2022. (AR 9-5 at 18-19; 9-3 at 36-68.)

On October 3, 2022, the ALJ issued a decision unfavorable to Ms. Lannan. (AR 9-3 at 11-23.)  By letter dated December 1, 2022, plaintiff sought review of the ALJ's decision, but the Appeals Council denied her request on January 18, 2023. (AR 9-7 at 42-43; AR 9-3 at 2-7.) Given the Appeals Council's denial, the ALJ's decision effectively became the final decision of the Commissioner, subject to judicial review under 42 U.S.C. § 405(g).[5] The present case was instituted on March 24, 2023. (#1.)

---

[3] "AR" refers to the administrative record filed on the docket. The document and page numbers referenced are from ECF.

[4] Plaintiff agreed to the telephone hearing which was necessitated by the COVID-19 pandemic. (AR 9-3 at 11; 9-6 at 27-30.) She participated in the hearing, as did her attorney and a vocational expert. (AR 9-3 at 11.)

[5] As described by the Supreme Court:
> Modern-day claimants must generally proceed through a four-step process before they can obtain review from a federal court. First, the claimant must seek an initial determination as to his eligibility. Second, the claimant must seek reconsideration of the initial determination. Third, the claimant must request a hearing, which is conducted by an ALJ. Fourth, the claimant must seek review of the ALJ's decision by the Appeals Council. See 20 CFR § 416.1400. If a claimant has proceeded

2

B. <u>Health Conditions</u>.

Plaintiff's motion for reversal of the Commissioner's decision is primarily based on her contention that the ALJ failed to discharge the step 5 burden of showing that jobs exist which plaintiff can perform given her Residual Functional Capacity ("RFC"). Ms. Lannan further asserts that the ALJ did not assess properly her decompensation vis-à-vis her hospitalizations in February 2019 and August 2019, and, consequently, she should have been afforded additional RFC limitations. Although the court will review the lengthy medical history, given that these grounds for reversal are circumscribed, discussion of the record will be somewhat abbreviated, concentrating on those issues germane to the resolution of the motion.

On February 7, 2019,[6] Ms. Lannan was admitted to Sturdy Memorial Hospital for evaluation of her mental state following a suicide attempt. (AR 9-10 at 40-84.) Plaintiff overdosed on her medications after consuming several vodka drinks and having a fight with her husband. *Id.* Her mental status was extremely slowed upon admission but improved over time as she became sober. *Id.* The medical records reflect that plaintiff's mentation was clear within 24 hours. *Id.* On February 8, 2019, she acknowledged she had multiple stressors, particularly financial, but denied any further suicidal ideation. *Id.* Ms. Lannan agreed to a placement at Southcoast Behavioral Health for treatment with a transfer scheduled for February 11, 2019. *Id.* After being admitted, plaintiff remained at Southcoast Behavioral Health until February 17, 2019. (AR 9-12 at 537-551.)

---

through all four steps on the merits, all agree, § 405(g) entitles him to judicial review in federal district court.

*Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019).

[6] Ms. Lannan alleges disability as of February 4, 2019, so no medical records before that date need to be examined.

On May 2, 2019, Ms. Lannan was seen at Boston Healthcare in Walpole for a complete evaluation. (AR at 9-17 at 745-842.) Her chief complaint was that she had been discharged from Southcoast Behavioral Health after she tried to overdose, but she did not want to return to her prior psychiatrist. *Id.* Plaintiff denied problems associated with anger, chemical dependency, any behaviors typical of a conduct disorder, any symptoms suggestive of dementia, any symptoms of grief, Oppositional Defiant Disorder, Personality Disorder, or Autism. *Id.* She did not exhibit any unusual or excessive anxiety, and she denied symptoms of depression or suicidal ideation. *Id.* On examination, Ms. Lannan presented as calm, glum, happy, inattentive, distracted, communicative, and tense. *Id.* Her mood was normal with no signs of depression or mood elevation, but there were signs of anxiety. *Id.* The diagnoses were adjustment disorder with mixed disturbance of emotions and conduct, attention-deficit/hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), generalized eating disorder, and binge eating disorder. *Id.* At that time, Ms. Lannan's medications were Clonazepam, Vyvanse, and Hydroxyzine Pamoate. *Id.*

At a visit to Boston Healthcare on June 11, 2019, plaintiff related being stressed by her children and family situation. *Id.* She described no psychiatric complaints and specifically denied psychotic, depressive, or anxiety symptoms. *Id.* Upon examination, Ms. Lannan displayed no apparent serious mental status abnormalities. *Id.* Her provider added Wellbutrin and Clonidin to her medication regimen, and discontinued Vyvanse. *Id.*

At an August 8, 2021 follow-up visit to Boston Healthcare, plaintiff advised that she started an intensive outpatient therapy ("IOT") program at the Fuller facility, but that her depression had worsened. *Id.* On examination, she presented as calm, friendly, flat, glum, downcast, doleful, wary, guarded, distracted, and communicative, but looked unhappy and anxious. *Id.* Ms. Lannan showed signs of moderate depression. *Id.* On August 19, 2021, plaintiff disclosed a history of opiate abuse.

4

*Id.* The substance abuse caused her high anxiety; she had not revealed it in the past because she did not want to be judged. *Id.* She agreed to inform her psychiatric provider about the issue and planned to get on Suboxone. *Id.*

Ms. Lannan was a patient at Arbour-Fuller Hospital from August 7 through August 21, 2019, for treatment of depression and anxiety. (AR 9-12 at 552-605.) During that time, plaintiff met with a clinician and attended group sessions to learn more effective coping skills. *Id.* Her symptomology improved, and she became less depressed and anxious. *Id.*

On August 26, 2019, plaintiff underwent a complete evaluation and intake at Boston Healthcare. (AR at 9-17 at 745-842.) She described her symptoms of depressive disorder and noted that, although she wished to be dead, she had no suicidal intentions, and her thoughts were better managed now that she was on medication. *Id.* Ms. Lannan also detailed her PTSD and panic attacks. *Id.* Plaintiff was found to be in continued need for outpatient treatment and medication. *Id.*

A Boston Healthcare record for September 5, 2019, reflects that plaintiff had recently started on Suboxone and that no psychiatric complaints, i.e., psychotic, depressive, or anxiety symptoms, were expressed. (AR at 9-17 at 745-842.) She showed no signs of depression, anxiety, or attentional or hyperactive difficulties. *Id.* In a further follow-up appointment on September 30, 2019, Ms. Lannan reported having problems keeping appointments due to childcare issues and being easily overwhelmed. *Id.* She reported periods of high anxiety with her children, as they required a lot of attention, and her husband was frequently absent due to Alcoholics Anonymous ("AA") obligations. *Id.* While her sleep had improved, she still had her ups and downs, her schedule was hectic, and she felt disorganized. *Id.*

At an appointment at Boston Healthcare on October 7, 2019, Ms. Lannan related that she had spoken with her husband and was doing better, although she continued to have periods of high anxiety with symptoms of panic and becoming easily overwhelmed. (AR at 9-17 at 745-842.) She was maintaining her sobriety, and it was easier to cope with her mood swings. *Id.* Later that month, on October 28, 2019, plaintiff reported that she had anxiety symptoms and episodic, but manageable, depressed mood, but she was also experiencing improvement. *Id.*

During a visit to Boston Healthcare on November 4, 2019, Ms. Lannan reported that she was doing well overall. (AR at 9-17 at 745-842.) Although she had periods of high anxiety, she had had no panic attacks since her last visit. *Id.* She had episodes of depression, but they were manageable. *Id.* Plaintiff was complying with her medication regime, and her behavior was stable. *Id.* At a November 25, 2019 visit, Ms. Lannan explained that she was stressed about the upcoming holidays, but she was dealing with it. *Id.*

On December 9, 2019, plaintiff had a follow-up visit at Boston Healthcare. (AR at 9-17 at 745-842.) She reported that she was doing okay, and that Thanksgiving with her family had gone better than expected. *Id.* While she had periods of high anxiety, her number of panic attacks had decreased. *Id.* Despite holiday-related stresses, Ms. Lannan was trying to stay positive. *Id.* On January 6, 2020, she stated that she was doing well overall, although she was experiencing stress related to her family. *Id.* She was coping effectively with periods of high anxiety and was having no panic attacks. *Id.* At a January 13, 2020 appointment, plaintiff exhibited no signs of depression or anxiety. *Id.*

Ms. Lannan had a follow-up visit at Boston Healthcare on March 9, 2020. (AR at 9-17 at 745-842.) She reported an increase in anxiety because her mother was moving to Israel, which brought up abandonment issues. *Id.* She expressed feelings of anger, but she had no gross

abnormalities in her mental status, no signs of depression or manic process, no signs of anxiety, and no signs of attentional or hyperactive difficulties. *Id.*

On May 4, 2020, plaintiff had an appointment at Boston Healthcare. (AR at 9-17 at 745-842.) She reported that in general she was coping effectively with the stresses related to Covid - 19. *Id.* The demands of her children increased her irritability and frustration. *Id.* Ms. Lannan had another telephonic visit the following day where she stated that she was active and appropriate. *Id.* She was caring for her children while her husband worked. *Id.* Her attention had decreased because she was no longer taking her Attention Deficit Disorder ("ADD") medications. *Id.* On June 1, 2020, it was noted that Ms. Lannan had made some improvement in that she could concentrate better and felt good about it. *Id.* She exhibited no signs of depression or anxiety, and she expressed no psychiatric complaints. *Id.*[7]

C.   Advising Physicians.

On July 22, 2021, Lois Condie, Ph.D., an advising psychologist for Massachusetts Disability Determination Services ("DDS"), determined on initial review that, consequent to mental impairment, plaintiff was mildly limited in understanding, remembering, or applying information; moderately limited in interacting with others; moderately limited in her ability to concentrate, persist, or maintain pace; and mildly limited in adapting or managing herself. (AR 9-4 at 3-13.) Dr. Condie concluded that Ms. Lannan was able to maintain attention, concentration, persistence, and pace for routine tasks for two hours at a time in a normal workday/week, with normal supervision. *Id.* Further, plaintiff was able to tolerate the minimum social demands of a simple-tasking setting with attendant simple changes in routine, avoid hazards, travel independently, and make and carry out simple plans. *Id.*

---

[7] Plaintiff was last insured for disability insurance benefits on June 30, 2020. The remaining Boston Healthcare records need not be reviewed as they post-date her date last insured.

On August 3, 2021, again on initial consideration, John Benanti, M.D., an advising internal medicine physician for DDS, assessed Ms. Lannan as being able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; was unlimited in her ability to push or pull with both her upper and lower extremities; could stand and/or walk about 6 hours in an 8 hour workday; and could sit about 6 hours in an 8 hour workday. (AR 9-4 at 3-13.) Plaintiff was never able to climb ladders, ropes or scaffolds, but could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. *Id.* Ms. Lannan was to avoid concentrated exposure to workplace hazards such as unprotected heights due to her intermittent/chronic foot pain. *Id.*

On September 13, 2021, Steven Fischer, Psy.D., an advising psychologist for DDS, on reconsideration of Ms. Lannan's claim, determined that due to mental impairment, she would have a mild mental limitation in her ability to understand, remember, or apply information and adapt or manage herself and a moderate limitation in her ability to interact with others and concentrate, persist, or maintain pace. (AR 9-4 at 15-22.) Dr. Fischer concluded that Ms. Lannan was able to carry out simple and some detailed instructions in 2-hour increments in an 8-hour day over a 40-hour workweek with occasional lapses in concentration and that she could tolerate minimum social demands of a simple-tasking setting. *Id.* Dr. Fischer found that plaintiff was "currently seen for having adjustment difficulties; she is capable of [activities of daily living ("ADLs")] but is guarded with flat affect, for the most part relates adequately, has some executive function problems, is cognitively intact; at recon does not allege new or worsening psych; affirming prior decision." *Id.*

Also on September 13, 2021, Mary Connelly, M.D., an advising internal medicine physician for DDS, on reconsideration opined that plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, she could stand and/or walk for about 6 hours in an 8-hour workday, and she could sit for the same length of time. (AR 9-4 at 15-22.) Dr. Connelly also

concluded that Ms. Lannan could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl. *Id.*

   D. <u>Plaintiff's Testimony</u>.

   At the June 2, 2022 administrative hearing, Ms. Lannan testified that she lived in an apartment in North Attleboro with her husband and three children, ages seven months, eight, and twelve, for whom she provided the primary care. (AR 9-3 at 42-43.) Her past work included pizza cook, cashier, line cook, customer service, pizza delivery driver, pizza store manager, barista, and coffee shop supervisor. (AR 9-3 at 44-47.)

   Ms. Lannan injured her tailbone in 2003 or 2004 and went to physical therapy; however, she had no further formal treatment for her back. (AR 9-3 at 50.) Plaintiff experienced physical issues after having surgery in 2011 for recurring cysts on her right foot and in 2012 for a left foot fracture. (AR 9-3 at 47-48.) Post-surgery for the cysts, plaintiff had no further formal treatment for her foot. (AR 9-3 at 51.) Post-surgery for her ankle, she completed physical therapy in 2012 and had no further treatment for her ankle apart from medical examinations and x-rays. (AR 9-3 at 48-49.)

   Plaintiff testified that in addition to physical ailments, she had been treated for depression, PTSD, generalized anxiety disorder, ADD, and substance abuse disorder. (AR 9-3 at 51-52.) She took medication for ADD and has had some improvement as a result. (AR 9-3 at 52.) Ms. Lannan explained that her depression affected her basically every day in that she felt sad or hopeless and experienced lack of energy, crying episodes, memory problems, and indecision. (AR 9-3 at 53.) Her anxiety also affected her daily, although her panic attacks had decreased to three or four times per week due to her medications. (AR 9-3 at 53.) Plaintiff's children and certain family members were triggers for her anxiety and panic attacks. (AR 9-3 at 56.) She also had social anxiety, so

being in certain social situations could trigger panic attacks. (AR 9-3 at 63.) Ms. Lannan's PTSD was related to several incidents over the years and caused her to have nightmares and flashbacks. (AR 9-3 at 55.)

Between February 2019 and June 2020, plaintiff saw a therapist once a week. (AR 9-3 at 56-57.) She also saw a psychiatrist about every two months, depending on when she was starting a new medication. (AR 9-3 at 57.) From February 2019 to June 2020, Ms. Lannan found her medications and counseling to be 50 to 60 percent effective in reducing her anxiety, depression, and symptoms of PTSD. (AR 9-3 at 57.) She had fewer panic attacks, and her ADD and depression symptoms improved. (AD 9-3 at 58.) Plaintiff's anxiety medications could make her a little drowsy, while her other medications had only temporary side effects. (AR 9-3 at 59.)

Plaintiff was hospitalized due to a suicide attempt and depression condition from February 7 through 9, 2019, at Sturdy Memorial Hospital; she was then transferred to South Coast Behavioral Health for inpatient treatment from February 9 through 19, 2019. (AR 9-3 at 58-59.) From August 7 through 21, 2019, Ms. Lannan participated in an intensive outpatient treatment program at Arbour-Fuller Hospital. (AR 9-3 at 59.) The last time plaintiff used pain killers or alcohol was August 5, 2019. (AR 9-3 at 61-62.) She takes Suboxone and has been clean and sober since that date. (AR 9-3 at 61.)

From February 2019 to June 2020, plaintiff was able to drive, cook, do laundry, wash dishes, and clean up, albeit somewhat inconsistently. (AR 9-3 at 60.) She painted as a hobby almost daily. (AR 9-3 at 60.) She went to AA meetings a couple of times per week. (AR 9-3 at 61.) Ms. Lannan enjoyed listening to music and spent most of her time with her baby. (AR 9-3 at 62.)

E. Vocational Expert's Testimony.

After Dawn Blythe, the vocational expert, reviewed plaintiff's past work experience, the ALJ posed the following hypothetical:

Assume a person of the claimant's age, education, and work experience who can lift and carry twenty pounds occasionally, lift and carry ten pounds frequently, and walk for about six hours, sit for about six hours[,] [o]ccasionally climb ramps and stairs[,] [o]ccasionally climb ladders, ropes and scaffolds[,] [and] [o]ccasionally balance, stoop, kneel, crouch, and crawl. This person will be able to maintain attention, concentration, persistence based on simple tasks, simple instructions for two hours at a time over an eight-hour day, forty-day week with conventional customary breaks. Person would be able to tolerate occasional interaction with the general public, and occasional interaction with supervisors. Can this person do any of claimant's past relevant work?

(AR 9-3 at 65-66.) Ms. Blythe answered in the negative but stated that there was other work that she could perform, specifically, "[h]ousekeeping, cleaner, 323.687-014, SVP 2, exertional level light, 40,731. Photocopy machine operator, 207.685-014, SVP 2, exertional level light, 16,965. Routing clerk, 222.687-022, SVP 2, exertional level light, 41.194." *Id.* at 66. The hypothetical person could still do the same three jobs if that person could have no interaction with the general public. *Id.* Ms. Blythe agreed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and her own experience. *Id.* at 67.

In response to questions from plaintiff's counsel, Ms. Blythe testified that with respect to the amount of time it takes to learn the skills to be able to perform a job at an SVP 2 level, it would be "anything beyond a short demonstration and up to and including one month." *Id.* During the training period for an SVP level 2 job, Ms. Blythe opined that the hypothetical person would have more that occasional contact with the supervisor "[u]sually for a couple of days." *Id.*

## III.   DISABILITY STANDARD AND THE ALJ'S FINDINGS.

### A.   Disability Standard.

Eligible claimants for SSI benefits must demonstrate that they are, among other things, aged, blind, or "disabled" within the meaning of the Social Security Act. 42 U.S.C. §§ 1382(a)(1), 1382c(a)(1)(A) ("For purposes of [SSI eligibility], the term 'aged, blind, or disabled individual' means an individual who is 65 years of age or older, is blind . . . , or is disabled (as determined

under [§ 1382c(a)(3)]). . . ."); *see Allison M. v. Kijakazi*, No. 22-cv-10033-FDS, 2023 WL 5650100, at *5 (D. Mass. Aug. 31, 2023). "'Disability' is defined, in relevant part, as the inability 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Allison M.*, 2023 WL 5650100, at *5 (quoting 42 U.S.C. § 1382c(a)(3)(A)). The impairment(s) must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 1382c(a)(3)(B). Relevant to the issues presented in this case, "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

ALJs use the familiar five-step test to determine if an individual is "disabled" according to the above definition. 20 C.F.R. § 416.920 (test); *Purdy v. Berryhill*, 887 F.3d 7, 10 (1st Cir. 2018); *Phillips v. Kijakazi*, No. 4:22-cv-10319-IT, 2023 WL 5807344, at *3 (D. Mass. Sept. 7, 2023).

> The test asks questions that are sequential and iterative, such that the answer at each step determines whether progression to the next is warranted: (Step 1) whether the claimant is currently engaging in substantial gainful activity; if not, (Step 2) whether the claimant has a severe impairment; if so, (Step 3) whether the impairment meets or medically equals an entry in the Listing of Impairments; if not, (Step 4) whether the claimant's [RFC] is sufficient to allow her to perform any of her past relevant work; and if not, (Step 5) whether, in light of the claimant's RFC, age, education, and work experience, she can make an adjustment to other work available in the national economy.

*Sacilowski v. Saul*, 959 F.3d 431, 433-34 (1st Cir. 2020) (citing 20 C.F.R. §§ 404-1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v) (2012)); *see also Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920 (2001)). The SSI applicant bears the burden of proof on steps 1 through 4; at step 5, the burden shifts to the Commissioner to come forward "'with evidence of specific jobs in

the national economy that the applicant can still perform,' or else a finding of disability is required." *Purdy*, 887 F.3d at 9-10 (quoting *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001)); *see also Sacilowski*, 959 F.3d at 434; *Seavey*, 276 F.3d at 5. "At that juncture, the ALJ assesses the claimant's [RFC] in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether . . . she can engage in any kind of substantial gainful work which exists in the national economy." *Allison M.*, 2023 WL 5650100, at *5 (citing 20 C.F.R. §§ 416.920(g), 416.960(c)).

B.  The ALJ's Findings.

In evaluating the evidence in this case, the ALJ followed the mandated five-step procedure. In his decision, the ALJ found that Ms. Lannan had not engaged in substantial gainful activity from her alleged onset date of February 4, 2019, through June 30, 2020 (the last date on which she met the insured status under the Social Security Act). (AR 9-3 at 13.)  The ALJ found that plaintiff had the following severe impairments: history of left ankle fracture, ganglion cysts of the feet, major depressive disorder, generalized anxiety disorder, and attention-deficit disorder. *Id.* None of Ms. Lannan's impairments, or combination of impairments, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Appendix 1. *Id.* at 14. The ALJ determined that Ms. Lannan

> had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could occasionally climb, balance, stoop, kneel, crouch, or crawl. The claimant could maintain concentration, persistence, and pace on simple tasks. The claimant could perform simple tasks for two-hour periods over an eight-hour workday and a forty-hour workweek or equivalent work schedule. The claimant could tolerate no interaction with the general public, and she could tolerate occasional interaction with supervisors.

*Id.* at 16.  Plaintiff was 34 years old[8] on her date last insured, she had at least a high school diploma, and transferability of job skills was found to be immaterial in her case. *Id.* at 22.

The ALJ concluded that "[t]hrough the last date insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed." *Id.* Based on this finding, Ms. Lannan was determined to be not disabled within the meaning of the Social Security Act from February 4, 2019, through June 30, 2020. (AR 9-3 at 23.)

## IV.   STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

---

[8] Under the regulations, Ms. Lannan would be considered a "younger person," under age 45. *See* 20 C.F.R. 404.1563(c) ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.").

*Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) ("And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high . . . . [i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal citation and quotation marks omitted)); *Libby v. Astrue*, 473 Fed. Appx. 8, 8 (1st Cir. 2012).

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Biestek*, 139 S. Ct. at 1154; *Purdy*, 887 F.3d at 13. As the First Circuit explained:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Purdy*, 887 F.3d at 13; *Charkowski v. Berryhill*, No. 15-cv-13356-GAO, 2017 WL 1080910, at *1 (D. Mass. Mar. 22, 2017).

In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably lead to a different interpretation and result. *See Ward v. Comm'r of Soc. Sec. Admin.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172

F.3d 31, 35 (1st Cir. 1999) (per curiam); *Torres-Martinez v. Colvin*, No. 3:16-cv-30016-KAR, 2017 WL 1075072, at *5 (D. Mass. Mar. 21, 2017). Finally, "[e]ven in the presence of substantial evidence . . . the Court may review conclusions of law and invalidate findings of fact that are derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Sacilowski*, 959 F.3d at 437 (quoting *Nguyen*, 172 F.3d at 35); *see Purdy*, 887 F.3d at 13 ("Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or the courts." (internal quotation marks and citations omitted)).

## V.   DISCUSSION.

### A.   Whether plaintiff's RFC limitation to "occasional interaction with supervisors" precludes work that requires a training period entailing more than occasional interaction with supervisors.

Plaintiff's initial argument is that remand is mandated because the Commissioner did not discharge his duty at Step 5, because the ALJ ignored the vocational expert testimony showing that the RFC limitation to "occasional interaction with supervisors" precluded work. The Commissioner disagrees, contending that the ALJ's finding that Ms. Lannan had the RFC to perform work that requires occasional interaction with a supervisor is not inconsistent with the vocational expert's testimony.

It is best to set the conflict in context. At the administrative hearing, the ALJ posed the following hypothetical to the vocational expert:

> Q. … Assume a person of the claimant's age, education, and work experience who can lift and carry twenty pounds occasionally, lift and carry ten pounds frequently, and walk for about six hours, sit for about six hours. Occasionally climb ramps and stairs. Occasionally climb ladders, ropes, and scaffolds. Occasionally balance, stoop, kneel, crouch, and crawl. This person will be able to maintain attention, concentration, persistence based on simple tasks, simple instructions for two hours at a time over an eight-hour day, forty-hour week with conventional customary

16

breaks. Person would be able to tolerate occasional interaction with the general public, and occasional interaction with supervisors. Can that person do any of the claimant's past relevant work?

A. No.

Q. Can that person do any other work in the national economy? If the answer is yes, could you give me some examples?

A. Yes. Housekeeping, cleaner, 323.687-014, SVP 2, exertional level, light, 40,731. Photocopy machine operator, 207.685-014, SVP 2, exertional level light, 16,965. Routing clerk, 222.687-022, SVP 2, exertional level light, 41,194.

*****

Q. And ma'am, is your testimony consistent with the Dictionary of Occupational Titles and your experience?

A. All except that the DOT does not address interactions, off task time, and time from work. That issue is based on my training and experience.

(AR 9-3 at 66-67.) The vocational expert was then questioned by Ms. Lannan's attorney:

Q. How long does it take to learn the skills and be able to perform a job at an SVP 2 level?

A. And (sic) SVP 2 is anything beyond a short demonstration and up to and including one month.

Q. In your opinion, during the training period for an SVP 2 job, would a hypothetical person have more than occasional contact with the supervisor?

A. Usually for a couple of days.

Q. So, if the person was able to only have occasional contact with the supervisor, would they be able to make it through those couple of days to learn the job?

A. I mean, you know every job has that. I mean, if they can't make it through the training period of the job, that's – obviously they can't do the job.

Q. Okay.

A. But usually for every job you've got to sit with the supervisor to go through the training manual, fill out paperwork, and that's all part of how a first days' (sic) work. So, that's going to be in every job. If they can't do that, then they at that point, be (sic) won't be able to do the job.

*Id.* at 67-68.

In response to the ALJ's query, the vocational expert unequivocally stated that a hypothetical person with plaintiff's RFC could perform certain SVP 2 jobs. The vocational expert did not, however, directly answer the attorney's questions, and the ALJ asked no follow-up questions to clarify the record. The vocational expert's testimony is ambiguous, and this ambiguity was not addressed in the ALJ's opinion.

Plaintiff argues that the vocational expert's testimony establishes that the three SVP 2 jobs identified involve more that occasional interaction with supervisors and, as such, are outside of her RFC. The Commissioner takes the position that the training period[9] for a job is not within or part of the RFC because it is temporary and, by definition, "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . '[a] regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996) (emphasis in original). The First Circuit has yet to address this question, and other courts are split on the issue. *See, e.g.*, *Jonathan Daniel G. v. Saul*, No. 20 C 3160, 2022 WL 972407, at *2 (N.D. Ill. Mar. 31, 2022), *appeal dismissed and remanded sub nom. Guzman v. Kijakazi*, No. 22-1942, 2022 WL 17225911 (7th Cir. Oct. 27, 2022)[10] ("The Seventh Circuit has not decided whether an RFC that

_____

[9] In his motion, the Commissioner discusses a two-day training period (#19 at 14), but then notes in his sur-reply (#21 at 1 n. 1) that, according to the vocational expert's testimony, the training period for an SVP 2 job is anything beyond a short demonstration and up to and including one month. The vocational expert also testified that an individual would have more than occasional contact with supervisors during the training period, usually for a couple of days. There was no specific testimony elicited from the vocational expert regarding the length of the training periods involved with the three SVP 2 jobs that she identified as performable by plaintiff.

[10] The district court accepted the Commissioner's arguments and affirmed the Commissioner's decision. *Jonathan Daniel G.*, 2022 WL 972407 at *3. However, on appeal, the Seventh Circuit

limits a claimant to brief and superficial interaction precludes performance of a job that requires more interaction during the training period. However, as the Commissioner points out, the very definition of RFC suggests that it does not."); *see also* SSR 96-8P, 1996 WL 374184, at *2 (July 2, 1996) (stating that a person's "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis," *i.e.*, "8 hours a day, for 5 days a week" (emphasis in original)). Moreover, though some courts have held that an RFC like plaintiff's is work preclusive, *see, e.g.*, *Kenneth P. v. Saul*, No. 4:19-CV-0059-JMS-DML, 2019 WL 6463449, at *6 (S.D. Ind. Dec. 2, 2019), others have characterized that result as "untenable." *See Wright v. Comm'r of Soc. Sec.*, No. 1:12CV1103, 2013 WL 3873947, at *3 (N.D. Ohio July 25, 2013) ("[U]nder Plaintiff's theory, every single time an individual is limited to superficial interactions with others, the result would require an ALJ to determine that the claimant is entitled to benefits since training for a job necessarily involves more than superficial interaction with others. Such a result is untenable."); *Hemby v. Berryhill*, No. 15 CV1471 ACL, 2017 WL 951785, at *11 (E.D. Mo. Mar. 10, 2017) (same)); *see also Sczepanski v. Saul*, 946 F.3d 152, 159 (2nd Cir. 2020); *Elizabeth L.F. v. Kijakazi*, 2023 WL 3981441, *3-4 (D. Utah June 13, 2023).

At this juncture, the court need not address the parties' arguments because the actual substance of the vocational expert's testimony is open to interpretation. The ALJ did not discuss the entirety of that testimony in his opinion, making only a passing reference that his conclusion was "[b]ased on the testimony of the expert witness." (AR 9-3 at 22.) No attempt to reconcile the vocational expert's testimony in response to the ALJ's inquiry and to that of the attorney has been

---

noted that the parties filed a joint motion to remand "[i]n light of the district court's statement that it is inclined to modify its judgment." *Guzman*, 2022 WL 17225911, at *1.

made. It is within the province of the ALJ to resolve any discrepancies in the vocational expert's testimony in the first instance, not this court. The case must be remanded to allow the ALJ to undertake this task.

B.  Whether the ALJ properly assessed plaintiff's decompensation and incorporated her impairments into her RFC.

Plaintiff next argues that this case should be remanded because the ALJ failed properly to assess her decompensation and incorporate all of Ms. Lannan's impairments in her RFC. The Commissioner counters that the ALJ fully reviewed the record and that the evidence, in fact, supports a finding of improvement after plaintiff's hospitalization in August 2019.

Ms. Lannan makes much of the ALJ's statement that she "had two incidents involving suicidal ideation and emergent mental health treatment in February and August of 2019 respectively" (AR 9-3 at 15), contending that the ALJ misunderstood and downplayed the severity of these hospitalizations. First, that statement was made in the context of determining the extent of Ms. Lannan's impairment in the functional area of adapting and managing oneself, which the ALJ, and the advising physicians found to be mild. Second, the ALJ considered at length all of plaintiff's medical records from February 7, 2019, through early June of 2020. The ALJ acknowledged that in early February 2019, Ms. Lannan had attempted suicide by overdose of her medications after having a couple of drinks and fighting with her husband. *Id.* at 16. In August 2019, plaintiff was admitted to the hospital when she developed thoughts of walking into traffic after having a couple of alcoholic drinks and arguing with her husband. *Id.* at 17. After admitting to substance abuse, Ms. Lannan started on Suboxone in mid-August 2019, became sober, and maintained her sobriety through June 2020. *Id.* at 17-18.

In the months following August 2019, plaintiff reported at follow-up appointments that she felt more stable but could still be easily overwhelmed. (A.R. 9-17 at 745-842.) In October 2019

she stated that, although she continued to have panic attacks, dealing with her mood swings was becoming easier and her depression was manageable. *Id.* In November 2019, Ms. Lannan advised that she had had no panic attacks since her October visit and that she was doing well overall. *Id.* Her December 2019 and January 2020 follow-up visits were much the same: she was doing okay overall, she was coping with her anxiety, her panic episodes had decreased, and she was coping effectively with her stress. *Id.* In March, May, and June 2020, plaintiff noted that she was feeling stress related to her mother moving, and then Covid-19, but she was dealing with those stresses well overall. *Id.*

The court finds that the ALJ appreciated the nature and seriousness of Ms. Lannan's hospitalizations. The ALJ also found that the medical evidence showed that once plaintiff started taking Suboxone, became sober, began a new medication regime, and attended therapy sessions, her symptoms improved over time. The ALJ's RFC aligns with the opinions of the state advising physicians who also concluded that Ms. Lannan was only mildly limited at adapting and managing herself. (AR 9-4 at 3-13, 15-22.) Plaintiff testified that following her hospitalizations through June 2020, her medications and counseling were 50 to 60 percent effective in reducing her anxiety, depression, and symptoms of PTSD. (AR 9-3 at 57.) She had fewer panic attacks and her ADD and depression symptoms improved. *Id.* at 58.

Based on the record as a whole, the ALJ's RFC is supported by substantial evidence and will not be disturbed.

21

VI.    <u>CONCLUSION</u>.

For the reasons stated, plaintiff's Motion to Reverse the Decision of the Commissioner (#11) is ALLOWED in part and DENIED in part. The Motion to Affirm the Commissioner's Decision (#18) is ALLOWED in part and DENIED in part. The case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.


February 13, 2024                              <u>/s/ M. Page Kelley</u>
                                               M. Page Kelley
                                               United Staes Magistrate Judge